OPINIONS OF THE SUPREME COURT OF OHIO
     The full texts of the opinions of the Supreme Court of
Ohio are being transmitted electronically beginning May 27,
1992, pursuant to a pilot project implemented by Chief Justice
Thomas J. Moyer.
     Please call any errors to the attention of the Reporter's
Office of the Supreme Court of Ohio.  Attention:  Walter S.
Kobalka, Reporter, or Justine Michael, Administrative
Assistant.  Tel.:  (614) 466-4961; in Ohio 1-800-826-9010.
Your comments on this pilot project are also welcome.
     NOTE:  Corrections may be made by the Supreme Court to the
full texts of the opinions after they have been released
electronically to the public.  The reader is therefore advised
to check the bound volumes of Ohio St.3d published by West
Publishing Company for the final versions of these opinions.
The advance sheets to Ohio St.3d will also contain the volume
and page numbers where the opinions will be found in the bound
volumes of the Ohio Official Reports.

     The State of Ohio, Appellee, v. Carter, Appellant.
     [Cite as State v. Carter (1992),      Ohio St.3d     .]
     Criminal law -- Aggravated murder -- Death penalty upheld,
        when.
     (No. 91-963 -- Submitted May 20, 1992 -- Decided July 22,
1992.)
     Appeal from the Court of Appeals for Hamilton County, No.
C-890513.
     In December 1988, Clarence Carter, defendant-appellant,
and Johnny Allen were inmates in Range "E" at the Jail Annex to
the Hamilton County Courthouse.  Allen was being held on a
theft offense.  Carter had been found guilty of aggravated
murder on December 9, 1988, and was awaiting sentencing.  On
December 28, Carter struck and kicked Allen numerous times over
a twenty to twenty-five minute period, necessitating Allen's
hospitalization.  On January 5, 1989, Carter was sentenced to
life imprisonment for the prior aggravated murder.  On January
11, 1989, Allen died as a result of Carter's assault.
     Inmate Joseph Carroll testified that he and Allen were
watching television on a mid-December evening when Carter came
in and switched channels.  Allen said to Carter, "Don't we vote
on this?"  Without saying anything, Carter punched Allen in the
eye, then resumed watching television.  Allen left to clean up
the blood flowing from a cut above his eyebrow.  Inmates Calvin
Johnson and Phillip Brewer confirm that Allen and Carter
exchanged words, and that Carter struck Allen.  However,
Johnson and Brewer assert that Carter was watching TV, and
Allen changed the channel.  Allen did not report this incident
to jail authorities.
     Carroll further testified that about a week before
December 28, Carter found a broken metal spoon handle in a hole
in the shower ceiling.  After a brief discussion with Brewer,
Carter returned the handle to its hiding place.
     On December 28, after lunch, Johnson saw Carter retrieve
the metal handle from the shower ceiling.  Johnson asked Carter
what he was going to do.  Carter did not reply.  About ten
minutes later, around 1:10 p.m., the confrontation which led to
Allen's death began in "E" range, a common area into which
approximately twelve cells open.

According to Carroll, Allen was in his cell when Carter told him it was his turn to sweep the floor. As Allen walked past Carter to get a broom, Carter "jumped on him, punched him, [and] knocked him down." As Allen lay on the floor, Carter "leaned over him, punched him, kicked him and choked him." Several times during the assault Carter stopped and walked away before returning to the attack. Twice he used a mop to wipe blood off his tennis shoes. During the assault Carroll said to Carter, "[d]amn C.C., you don't like him, do you." Carter replied "no," and went "back down to where Johnny Allen was, punched him, kicked him some more, stomped on him."

After the second beating, Allen managed to get up and sit on a bench, but Carter came back, knocked him off the bench, and continued to kick and choke Allen. Allen never threw a punch or provoked Carter.

Inmate Calvin Steele described Carter's initial blow to Allen as a "sucker punch," delivered suddenly and without warning. Carter struck Allen ten or fifteen times. Allen never struck or attempted to strike a blow at Carter. At one point, Carter returned to his cell and stuck his own leg with some kind of object; he then came back and stomped on Allen's head with his foot. Carter's assault on Allen lasted twenty or twenty-five minutes. When Steele asked Carter to stop, Carter told Steele to "[g]et my ass back downstairs." (Steele was standing outside the range in the "bull run," the guard's access way.)

Richard Cunningham saw Carter hit Allen four or five times, then choke Allen, who lay on the floor. As he was beating Allen, Carter said, "[t]hat m..... f..... tried to stab me." Carter seemed to be in a rage, but appeared to know what he was doing.

Cunningham testified that "Carter started kicking him [Allen] down the range by his head, and by his ribs, and * * * he was pulling his head in my bars and stomping his head like a pop can on the floor. And his head was bouncing up off the floor. Blood was everywhere. Guys was on the range saying: Come on, CC, you are going to kill the man. Quit. Leave him alone. * * * Carter wouldn't let up. He kept on doing it and doing it, he wouldn't quit."

Carter claimed that Allen assaulted him with the shank and that he, Carter, merely defended himself, being carried away with rage. According to inmate Robert Chapman, a defense witness, the fight began when Allen, holding the metal spoon handle, began hitting Carter. However, Chapman acknowledged that he previously told investigators he was asleep. Howard "Tub" Burns, a high school friend of Carter, heard Carter yell, "Tub, get the police."

Brewer said he saw Carter and Allen arguing on December 28, and Allen was holding some kind of metal object in his hand. After a few seconds, Brewer returned to his cell. He explained, "[i]n a place like that you mind your own business, and that's what I was doing."

Around 1:30 p.m., sheriff's deputies heard unusual noises, like an object being banged against steel bars, and went to investigate. When they arrived at "E" range, they found Allen lying face down on the floor, in a pool of blood. Deputy Raymond J. Loebker saw Carter drop the shank. Loebker

described Carter as sweating, breathing heavily, but without any visible signs of injury. Sheriff's Lieutenant John Douglas saw the metal handle on the floor, four feet from Allen, and retrieved it for later examination.

Around 5:00 p.m., on December 28, Carter showed Detective John Hinrichs scratches Carter said he sustained in his fight with Allen. Carter had two or three scratches on his right thigh, scratches on his right arm, and a cut on his chest. None was deep or serious, and only the chest cut showed any sign of possible bleeding. Carter, muscular and strong, was in excellent physical condition.

Forensic examination revealed that Carter's socks, pants, and tennis shoes all contained type "O" human blood. Allen had type "O" blood, but Carter's blood type was not revealed at trial. Carter's T-shirt also had human blood, but the stain was not typed. Forensic examination revealed two human blood stains on the metal shank -- one stain was type O, the other was undetermined. The shank had no fingerprints on it.

The jury had to assess the credibility of the principal witnesses under unusual circumstances. Only inmates witnessed the assault, and they all had prior felony records. Additionally, the prosecution made various beneficial arrangements with inmates who testified for the prosecution. Several inmates who testified for the defense had known Carter before they were incarcerated.

When found, Allen was unconscious and had difficulty breathing. His ribs were pulsating, and blood was running out of his mouth. At University Hospital, Doctor Christopher Miller, a resident neurosurgeon, found bruises and lacerations about Allen's head, face and neck. Blood exuded from behind Allen's eardrums, signifying probable basilary skull fractures. Allen had a low level of brain system reflex functioning and was neither conscious nor able to communicate. Doctors connected life support systems.

Allen had suffered soft tissue swelling between his larynx and spine, but the cervical region was not fractured. A December 28 CAT scan revealed prominent soft tissue swelling over Allen's left front temporal region, a subdural hematoma between the brain's surface and the skull, and diffuse bleeding within the brain. Trauma was the cause of the injuries. However, deprivation of oxygen to Allen's brain could have been an additional factor.

According to Doctor Harry J. Bonnell, Chief Deputy Coroner, Allen's heart and breathing stopped on January 10th, but doctors revived him. A January 11th examination revealed that Allen was brain dead. Doctors then disconnected life support systems.

Dr. Bonnell performed an autopsy on January 12th. Allen was 5'10," and weighed 122 lbs. He died as a result of multiple bruises and swelling of the brain, caused either by blunt objects striking his head or by his head striking blunt objects. His brain had been deprived of oxygen prior to arrival at the emergency room. His injuries were consistent with his head having been banged against the floor or against steel bars. In Dr. Bonnell's opinion, these injuries were fatal, and Allen would have died within twenty-four hours of the trauma without medical intervention.

The jury convicted Carter of aggravated murder committed with prior calculation and design. Carter stipulated to the first death-penalty specification which alleged that the charged offense occurred while Carter was a prisoner in a detention facility. R.C. 2929.04(A)(4). The second death specification alleged a prior conviction for murder. R.C. 2929.04(A)(5) specifies, as a statutory aggravating circumstance, that "[p]rior to the offense at bar, the offender was convicted of an offense an essential element of which was the purposeful killing of * * * another * * *." Carter elected to have that second specification tried to the court. The court admitted documentary evidence of the prior conviction and found Carter guilty.

Following a sentencing hearing and the jury's death penalty recommendation, the trial court sentenced Carter to death. The court of appeals affirmed the conviction and the death penalty.

Arthur M. Ney, Jr., Prosecuting Attorney, and L. Susan Laker, for appellee.

Sand & Stidham, Chuck R. Stidham and Timothy A. Smith, for appellant.

Herbert R. Brown, J. R.C. 2929.05(A) requires a three-part analysis in capital cases. First, we must review the judgment and consider Carter's claims of error. Second, we must independently weigh the evidence of aggravating circumstances and mitigating factors. Third, we must decide whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases. For the reasons set forth below, we affirm the conviction and uphold the sentence of death.

I

Date of Conviction

In proposition of law I, Carter argues he was not convicted of his first murder until January 5, 1989 when he was sentenced to life imprisonment for aggravated murder. Carter argues that under Crim.R. 32(B), a judgment of conviction does not exist until sentence is imposed. See, also, R.C. 2945.75.

We agree. In State v. Henderson (1979), 58 Ohio St.2d 171, 12 O.O.3d 177, 389 N.E.2d 494, paragraph one of the syllabus, we held that a defendant, who had pled guilty but was awaiting sentencing for a theft offense, "* * * has not been previously convicted of a theft offense within the meaning of R.C. 2913.02(B)." Henderson noted that the majority of courts requires that a sentence be imposed before an offender can be regarded as having a prior conviction. Id. at 178, 12 O.O.3d at 181, 389 N.E.2d at 498. State v. Poindexter (1988), 36 Ohio St.3d 1, 5, 520 N.E.2d 568, 572, following Henderson, held that a defendant had not been twice convicted, "as there is only one order of execution, there can be only one conviction." Accord State v. Dapice (1989), 57 Ohio App.3d 99, 102, 566 N.E.2d 1261, 1265; State v. Darga (1985), 30 Ohio App.3d 54, 56, 30 OBR 109, 111, 506 N.E.2d 266, 268. See, also, Annotation (1988), 65 A.L.R.4th 838, 887; Annotation (1949), 5 A.L.R.2d 1080, 1104. Nonetheless, a prior conviction in which sentence was pending can be used for impeachment. State v. Cash (1988),

40 Ohio St.3d 116, 532 N.E.2d 111.

We find waiver inapplicable even though counsel failed to raise this point at trial. Carter's not guilty plea preserved his right to object to the alleged insufficiency of the evidence proving this prior conviction. The prosecution must prove each and every element of the offense beyond a reasonable doubt. Jackson v. Virginia (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560.

## II
### When the Murder Offense Occurred

However, accepting Carter's first proposition of law does not establish prejudicial error. A key remaining issue involves interpreting, in R.C. 2929.04(A)(5), the words "[p]rior to the offense at bar, the offender was convicted * * *." The offense at bar refers to the aggravated murder of Johnny Allen. But when did the "offense at bar" occur? In propositions of law II and III, Carter argues that this "offense at bar" occurred on December 28, when the assault occurred. However, the court of appeals held:

"* * * [T]he 'offense at bar,' the aggravated murder of Johnny Allen, did not exist until Allen died on January 12 [sic], 1989. * * * [Thus] the language of the specification * * * refers to the period of time prior to January 12, 1989."

In our view, the language "the offense at bar" means the aggravated murder of Johnny Allen. Before Allen died, Carter could only have been charged with felonious assault or attempted murder. But when Allen died, it became possible to charge Carter with aggravated murder. The offense, in effect, matured then. An earlier conviction for assault, when the victim was still alive, would not have barred a subsequent murder conviction. See State v. Tolbert (1991), 60 Ohio St.3d 89, 91, 573 N.E.2d 617, 620; State v. Thomas (1980), 61 Ohio St.2d 254, 15 O.O.3d 262, 400 N.E.2d 897, paragraph six of the syllabus. As the Supreme Court stated in Diaz v. United States (1912), 223 U.S. 442, 449, 32 S.Ct. 250, 251, 56 L.Ed. 500, 503:

"The death of the injured person was the principal element of the homicide, but was no part of the assault and battery. At the time of the trial for the latter the death had not ensued, and not until it did ensue was the homicide committed." (Emphasis added.)

The offense of aggravated murder matured on January 11, when Allen died. At that time, Carter had already been sentenced on January 5 for the previous aggravated murder. Thus, "[p]rior to the offense at bar, the offender was convicted of an offense an essential element of which was the purposeful killing of * * * another * * *." R.C.2929.04(A)(5).

In proposition of law III, Carter argues plain error because the trial court instructed the jury that Carter's prior conviction was an aggravating circumstance. In proposition of law VI, Carter argues this evidence was not harmless error. However, the trial judge did not err because evidence of the prior murder conviction was admissible as an aggravating circumstance, and the court's instructions were proper.

## III
### Ineffective Assistance of Counsel

In proposition of law V,1 Carter argues that he was denied his right to the effective assistance of counsel. Counsel did

not object to evidence of the prior conviction on the basis that the aggravated murder (the offense at bar) occurred on December 28, before Carter was convicted and sentenced for a prior murder on January 5, 1989.

Reversal of a conviction or sentence based on ineffective assistance of counsel requires meeting the two-prong standard of Strickland v. Washington (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. Strickland requires: (a) deficient performance, "errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment"; and (b) prejudice, "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland, supra, at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 692.

Carter fails to show that his counsel's performance at trial was deficient. Carter's counsel filed at least forty pretrial motions. Many were imaginative. Counsel contested almost every possible point. Moreover, counsel had no basis to object because evidence of the conviction was admissible.

IV

Death of Victim

In proposition of law VII, Carter argues that the state failed to establish when Allen became brain dead; hence, the evidence did not support the specification alleging a prior murder conviction.

We find the evidence sufficient to sustain the specification. In a review for sufficiency, the evidence must be considered in a light most favorable to the prosecution. Jackson v. Virginia, supra; State v. Davis (1988), 38 Ohio St.3d 361, 365, 528 N.E.2d 925, 930. "* * * [T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." State v. DeHass (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus.

The evidence established that Allen was alive when he entered University Hospital on December 28. Although Allen had a low brain system reflex function, his brain was working, his pulse was good, the doctors considered him alive, and life support systems were connected. Thus, he was alive then and life support systems kept Allen alive until January 11.

At trial, Dr. Bonnell testified that Allen "died on the eleventh of January," after he was pronounced brain dead. Since Dr. Bonnell was a coroner, his testimony is entitled to weight. See R.C. 313.19. Bonnell further testified, without any defense objection:

"Based upon my review of the medical records, Johnny Allen stopped breathing, and his heart stopped the day before he died, they got him going again, and the following day they did an examination that showed he was totally dead, in which case, he is dead. Even if you keep breathing for him, his brain is not working, and his life, his functions are not working."

R.C. 2108.30 specifies:

"An individual is dead if he has sustained either irreversible cessation of circulatory and respiratory functions or irreversible cessation of all functions of the brain, including the brain stem, as determined in accordance with accepted medical standards. If the respiratory and circulatory

functions of a person are being artificially sustained, under accepted medical standards a determination that death has occurred is made by a physician by observing and conducting a test to determine that the irreversible cessation of all functions of the brain has occurred.  * * *"  (Emphasis added.)

Dr. Bonnell's testimony was sufficient to establish that Allen died on January 11.

## V
## Intervening Cause of Death

In proposition of law VIII, Carter argues that while he "is responsible for the death of Johnny Allen, he is not responsible for the date of his death."  Carter argues that without medical intervention, Allen would have died within twenty-four hours of his injuries.  Thus, medical intervention prolonged Allen's life until after Carter had been sentenced on his first murder conviction.  From this, Carter argues that medical intervention was an intervening and superseding cause of Allen's death as related to the prior murder specification.

Admittedly, Allen might have died sooner without medical intervention.  However, Carter's proposition lacks merit.  When Carter assaulted Allen, the likelihood of medical intervention on Allen's behalf was readily foreseeable.  "It is a fundamental principle that a person is presumed to intend the natural, reasonable and probable consequences of his voluntary acts."  State v. Johnson (1978), 56 Ohio St.2d 35, 39, 10 O.O.3d 78, 80, 381 N.E.2d 637, 640.  Accord State v. Lott (1990), 51 Ohio St.3d 160, 168, 555 N.E.2d 293, 302; State v. Losey (1985), 23 Ohio App.3d 93, 23 OBR 158, 491 N.E.2d 379. Moreover, medical treatment for homicide victims is not an intervening cause.  See State v. Johnson, supra, at 40, 10 O.O.3d at 81, 381 N.E.2d at 640; Annotation, Homicide: Liability Where Death Immediately Results from Treatment or Mistreatment of Injury Inflicted by Defendant (1965), 100 A.L.R.2d 769, 783.

## VI
## Sufficiency of Evidence

In proposition of law IX, Carter contends that the evidence was insufficient to prove Carter caused Allen's death.  Carter correctly points out that, pursuant to Evid. R. 703, facts or data upon which an expert bases his opinion must be perceived by him or admitted in evidence at the hearing. See State v. Jones (1984), 9 Ohio St.3d 123, 9 OBR 347, 459 N.E.2d 526, syllabus.  Carter argues that Dr. Bonnell's testimony rested upon medical records not received into evidence and therefore Bonnell's testimony was inadmissible.

Carter's arguments are not persuasive.  First, Dr. Bonnell based his opinion on the cause of Allen's death on his personal experience and observation in conducting Allen's autopsy, not simply Allen's medical records.  As the coroner who performed the autopsy, Dr. Bonnell's testimony sufficiently established the cause of death.  See R.C. 313.19.

Second, the evidence establishing that Carter proximately caused Allen's death rests upon more than Dr. Bonnell's testimony.  The evidence established that Carter viciously choked, beat, and kicked Carter in the head over a twenty to twenty-five minute period causing unconsciousness and severe bleeding.  In cases of severe injuries, expert medical

testimony may not even be necessary.  See Commonwealth v. Gilman (1979), 485 Pa. 145, 401 A.2d 335; King v. State (1964), 251 Miss. 161, 168 So.2d 637; Diaz v. State (Okla.Crim.App. 1986), 728 P.2d 503; Annotation: Necessity and Effect, in Homicide Prosecution, of Expert Medical Testimony as to Cause of Death (1975), 65 A.L.R.3d 283, 292.

Third, three physicians, aside from Dr. Bonnell, testified to Carter's condition and his treatment in the hospital. Expert medical testimony established that Allen suffered from internal brain injuries, subdural hematoma, and prominent soft tissue injuries to the skull surface and neck.  One of these physicians, Doctor Chris Miller, testified that Allen was unconscious and had a low level of brain system reflex functioning when he was admitted following Carter's assault. The evidence that Carter caused Allen's death is overwhelming.

## VII
### Constitutionality

In propositions of law X, XI, XII, and XIII, Carter makes constitutional challenges to Ohio's death penalty statute which we have previously rejected.  Ohio's system of appellate review, including proportionality review, is constitutionally valid.  State v. Henderson (1988), 39 Ohio St.3d 24, 33, 528 N.E.2d 1237, 1246; State v. Steffen (1987), 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph one of the syllabus; State v. Jenkins (1984), 15 Ohio St.3d 164, 176-177, 199, 15 OBR 311, 322, 341, 473 N.E.2d 264, 279, 296.  Ohio's death penalty statute is neither arbitrary and capricious nor void for vagueness.  State v. Jenkins, supra, at 169-170, 171, 15 OBR at 315-316, 317, 473 N.E.2d at 273-274, 275; State v. Buell (1986), 22 Ohio St.3d 124, 139, 22 OBR 203, 216, 489 N.E.2d 795, 808-809; State v. Stumpf (1987), 32 Ohio St.3d 95, 103, 104, 512 N.E.2d 598, 607.  Additionally, Carter did not raise the issue in proposition of law XII at trial and thus waived it.  State v. Awan (1986), 22 Ohio St.3d 120, 22 OBR 199, 489 N.E.2d 277.  Carter's overall constitutional attack in proposition of law XIII has been rejected on numerous occasions.  State v. Poindexter, supra; State v. Buell, supra, at 135-136, 22 OBR at 213, 489 N.E.2d at 806; State v. Jenkins, supra.

## VIII
### Sentence

At the sentence hearing, Carter presented no evidence other than an unsworn statement.  He did not ask for a presentence report or mental examination.  In his unsworn statement, Carter said he was twenty-seven years old, had four brothers and two sisters, lived with one sister, and had three children of his own.  He did not know his real father until he was fifteen years old and was raised by his mother and a troublesome stepfather.  He left home at age fifteen and left school in the tenth grade.

Carter acknowledged that he was angry in his youth, but claims that he has since learned love and understanding through prayer and religion.  He has learned to love people and to control his temper.  Carter said he did not intend to kill Allen, that he was very sorry he did, and that he had prayed for Allen's recovery in the hospital.  Carter repented his past and recognizes that the Lord is with him now.

We find the evidence proved the two specified aggravating circumstances beyond a reasonable doubt. The offense was committed "while the offender was a prisoner in a detention facility * * *." Also, "[p]rior to the offense at bar, the offender was convicted of * * * the purposeful killing of * * * another * * *." R.C. 2929.04(A)(4) and (5).

After independently assessing the evidence, we find nothing mitigating in the nature and circumstances of the offense.

In considering statutory factors, we find that Allen had not "induced or facilitated" the offense within the meaning of R.C. 2929.04(B)(1). Nor did Carter act under "duress, coercion, or strong provocation," as set forth in R.C. 2929.04(B)(2). The scant evidence suggesting that Allen initiated the confrontation appeared contrived and unbelievable.

Carter presented no evidence of mental problems; hence, R.C. 2929.04(B)(3) did not apply. Carter's age of twenty-seven negated R.C. 2929.04(B)(4). Carter's prior aggravated murder conviction precludes a finding that he had no prior serious criminal history under R.C. 2929.04(B)(5). No other actors were involved; hence, R.C. 2929.04(B)(6) is inapplicable. Aside from his expressed remorse, no "other factors" merited mitigation. R.C. 2929.04(B)(7).

After considering the case, we conclude that the aggravating circumstances outweigh the single mitigating factor of Carter's remorse and promised reformation beyond a reasonable doubt. The aggravating circumstances are significant. A jury had found Carter guilty of another aggravated murder just three weeks before he attacked Allen, and he was in jail awaiting sentencing for that murder. We find the death sentence appropriate, proportionate and not excessive when compared with similar cases where a defendant has a prior conviction for a purposeful killing. R.C. 2929.04(A)(5). State v. Evans (1992), 63 Ohio St.3d 231, 586 N.E.2d 1042; State v. Davis (1992), 63 Ohio St.3d 44, 584 N.E.2d 1192; State v. Spirko (1991), 59 Ohio St.3d 1, 570 N.E.2d 229; State v. Bradley (1989), 42 Ohio St.3d 136, 538 N.E.2d 373; State v. Mapes (1985), 19 Ohio St.3d 108, 19 OBR 318, 484 N.E.2d 140. The sentence is also appropriate, proportionate and not excessive when compared with similar cases where a defendant was a prisoner in a detention facility. R.C. 2929.04(A)(4); State v. Bradley, supra; State v. Zuern (1987), 32 Ohio St.3d 56, 512 N.E.2d 585.

Accordingly, we affirm the conviction and the sentence of death.

                                        Judgment affirmed.

Moyer, C.J., Sweeney, Holmes, Douglas, Wright and Resnick, JJ., concur.

FOOTNOTES

1  No proposition of law IV was submitted in Carter's brief.