[Cite as *State v. Norman*, 2026-Ohio-779.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## ASHTABULA COUNTY

STATE OF OHIO,

        Plaintiff-Appellee,

- vs -

DAMIEN LUJUANE NORMAN,

        Defendant-Appellant.

**CASE NO. 2025-A-0023**

Criminal Appeal from the
Court of Common Pleas

Trial Court No. 2023 CR 00568

---

## OPINION AND JUDGMENT ENTRY

Decided: March 9, 2026
Judgment: Affirmed

---

*April R. Grabman*, Ashtabula County Prosecutor, and *Dane R. Hixon*, Assistant Prosecutor, 25 West Jefferson Street, Ashtabula, OH 44047 (For Plaintiff-Appellee).

*Thomas J. Simon*, 1105 Bridge Street, P.O. Box 3048, Ashtabula, OH 44005, and *L. Bryan Carr*, 1392 SOM Center Road, Mayfield Heights, OH 44124 (For Defendant-Appellant).

EUGENE A. LUCCI, J.

{¶1}    Appellant, Damien Lujuane Norman, appeals the judgment of the Ashtabula County Court of Common Pleas, convicting him one count of felonious assault, with a firearm specification, and one count of having weapons while under disability. Mr. Norman takes issue with his trial counsel's effectiveness, the trial court's alleged inconsistent dismissal of one of the jurors, the alleged admission of hearsay evidence, his sentence, as well as the weight and sufficiency of the evidence. We affirm the trial court's judgment.

{¶2}    On October 22, 2023, Angela Hamilton, Mr. Norman's mother, and the victim, Anthony Beninato, were out together visiting local wineries. The couple went to

Grand River Cellars, and Mr. Norman joined them for dinner at the establishment. From there, Ms. Hamilton drove with Mr. Beninato to the latter's residence, and Mr. Norman followed them. Mr. Beninato stated that he and Mr. Norman never had any problems before the night of October 22, 2023.

{¶3} The group gathered around a small fire in Mr. Beninato's yard. At some point, Mr. Norman advised Mr. Beninato "[t]o not put his hands on [his] mom no more." Although no issues had occurred between the individuals that day or night, Ms. Hamilton and Mr. Norman decided to leave Mr. Beninato's home. Mr. Beninato, however, wanted Ms. Hamilton to stay with him that night. She declined, causing Mr. Beninato to become agitated.

{¶4} Ms. Hamilton and Mr. Norman then went to Ms. Hamilton's residence. Mr. Norman had advised Mr. Beninato not to go to Ms. Hamilton's home. Mr. Beninato began "blowing up" Ms. Hamilton's phone. He eventually arrived at Ms. Hamilton's home, however, and apparently the two began arguing. Through a window inside Ms. Hamilton's residence, Mr. Norman observed Mr. Beninato pushing and shoving his mother. Mr. Norman then retrieved his wife's unloaded firearm which was stored in a closet in Ms. Hamilton's home. Mr. Norman exited the house and struck Mr. Beninato one time with the gun on the skull. Mr. Norman fled the scene.

{¶5} Mr. Beninato was taken to the hospital after which Ms. Hamilton discussed the incident with police. She informed police that Mr. Norman was responsible for Mr. Beninato's injuries. The strike caused Mr. Beninato two skull fractures, multiple brain bleeds, and memory loss.

{¶6} The day after the incident, police obtained a warrant and searched Mr. Norman's home. Mr. Norman was detained and given *Miranda* warnings. He initially told officers he disassembled the gun and discarded half of it into a local river. Mr. Norman, however, later admitted he had disassembled the weapon and hid the parts throughout his house. He led police to the various parts of the disassembled firearm which was collected as evidence.

{¶7} On October 24, 2023, police interviewed Mr. Norman. At the interview, he admitted to striking Mr. Beninato but maintained he did so to protect his mother. Mr. Norman admitted he retrieved the firearm, which he insisted belonged to his wife, from the closet in his mother's home. Evidence later showed Mr. Norman had a prior conviction for felony-four domestic violence, which barred him from possessing a firearm.

{¶8} Mr. Norman was indicted on one count of felonious assault, in violation of R.C. 2903.11(A)(2) and (D)(1)(A), a felony of the second degree. That count carried a firearm specification pursuant to R.C. 2941.145(A). He was also indicted on one count of having weapons while under disability, in violation of R.C. 2923.13(A)(2) and (B), a felony of the third degree.

{¶9} During plea negotiations, Mr. Norman rejected a plea offer from the State through which he would plead guilty to both counts, receive a stipulated six-year sentence, to run consecutively in a separate case not subject to this appeal, for a total of 12 years. After electing to proceed to trial, Mr. Norman, via defense counsel, filed a notice of self-defense of another.

{¶10} Prior to trial, defense counsel filed four motions to continue the matter. Because counsel's motions for continuance are relevant to the analysis of the underlying

Case No. 2025-A-0023

appeal, it is important to note that counsel's first request for continuance was premised upon his recognition that he "was not prepared to go to trial at this time." The second motion for continuance was based upon defense counsel's need for certain medical tests. His third motion for continuance was founded upon the unavailability of a "key witness for the defense." And the fourth request for continuance was premised upon counsel's need to have a doctor review medical records relating to the incident. Each motion was granted.

{¶11}  The matter proceeded to trial after which Mr. Norman was found guilty on all charges. Mr. Norman was sentenced to three years in prison on the firearm specification, eight to 12 years on the felonious assault charge, and three years in prison on the weapons under disability charge. The trial court ordered the prison terms to be served consecutively for a total of 14 to 18 years in prison. This appeal followed.

{¶12}  Mr. Norman assigns six errors for this court's review. His first alleges:

{¶13}  "Appellant was deprived of his right to effective assistance of counsel."

{¶14}  Mr. Norman makes multiple challenges to counsel's effectiveness. We shall address each in turn.

{¶15}  To prevail on a claim of ineffective assistance of counsel, "a defendant must prove that counsel's performance was deficient and that the defendant was prejudiced by counsel's deficient performance." *State v. Davis*, 2020-Ohio-309, ¶ 10, citing *State v. Bradley*, 42 Ohio St.3d 136, 141-142 (1989); and *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "Thus, the defendant must demonstrate that counsel's performance fell below an objective standard of reasonableness and that there exists a reasonable probability that, but for counsel's error, the result of the proceeding would have been different." *Davis* at ¶ 10, citing *Bradley* at paragraphs two and three of the syllabus.

{¶16} "'In order to establish prejudice, an appellant must overcome a strong presumption that licensed attorneys are competent and that the challenged action is the product of a sound strategy.'" *State v. Love*, 2023-Ohio-3690, ¶ 31 (11th Dist.), quoting *State v. Shirey*, 2006-Ohio-256, ¶ 13 (9th Dist.). Thus, "'[d]ebatable strategic and tactical decisions will not form the basis for a claim of ineffective assistance of counsel, even if there had been a better strategy available.'" *State v. Kovacic*, 2012-Ohio-219, ¶ 46 (11th Dist.), quoting *State v. Beesler*, 2003-Ohio-2815, ¶ 13 (11th Dist.).

{¶17} Mr. Norman first asserts that trial counsel's four motions for continuance suggested he was not prepared for trial and thus failed to provide an effective defense. Mr. Norman claims trial counsel filed his first continuance on March 19, 2024, seven days before trial, stating counsel was "not prepared to go to trial at this time." He claims this representation was disconcerting because the case had been pending since December 2023. On May 13, 2024, eight days before trial, trial counsel filed a second motion for continuance. In this motion, counsel stated he was scheduled for medical tests within the timeframe of trial. Mr. Norman maintains this is concerning because counsel should have known of his medical tests well before the time of filing the continuance. Next, on August 5, 2024, trial counsel filed the third motion for continuance, arguing a key witness is out of town and not available. Mr. Norman claims "counsel called zero (0) witnesses at trial," and therefore this motion indicated a lack of awareness of his defense. Finally, on October 9, 2024, trial counsel filed the fourth motion in which he represented he possessed approximately 400 pages of medical records to review and he would require a doctor to review these records. Mr. Norman asserts that counsel never interviewed or met with a

doctor or any "other witnesses." He therefore claims trial counsel was ineffective for seeking the various continuances.

{¶18}  In general, "[t]he fact that an attorney seeks a continuance . . . does [not] necessarily portray a violation of counsel's duty of representation. . . . The client's preferred defense strategies do not necessarily govern his counsel's decisions." *State v. Phillips,* 2004-Ohio-4688, ¶ 41 (2d Dist.). Further, a defendant "must overcome the presumption that, under the circumstances, the delay caused by his attorney through the seeking of continuances, 'might be considered sound trial strategy.'" *State v. Tate,* 1993 WL 268462, *1 (6th Dist. July 16, 1993), quoting *Michel v. Louisiana*, 350 U.S. 91 (1955); and *Strickland*, 466 U.S. at 689. *See also State v. Pope*, 2023-Ohio-865, ¶ 37 (6th Dist.), quoting *State v. Wynn*, 2014-Ohio-420, ¶ 90 (2d Dist.) ("the decision whether to request a trial continuance is debatable, and involves a strategic choice of counsel that falls 'within the realm of trial strategy and tactics that will not ordinarily be disturbed on appeal'").

{¶19}  Mr. Norman admits that motions for continuance are not unusual in criminal cases, and, in this respect, concedes that trial counsel's actions do not fall below an objectively reasonable metric for performance in the context of criminal defense. Of equal significance, Mr. Noman fails to identify how he was prejudiced by counsel's motions to continue. Indeed, it goes without saying that a defense attorney who is thoroughly prepared for trial by his or her *own estimation* will provide a better defense for a defendant than one who proceeds without full preparation. Mr. Norman's claim does not meet either prong of the *Strickland* test for ineffectiveness and, in this respect, it is without merit.

{¶20} Next, Mr. Norman claims defense counsel's opening statement demonstrated his ineffectiveness and lack of preparation. Mr. Norman points out that defense counsel's opening included the following statement: "Obviously, we hope you return a not guilty verdict, but I appreciate you and my client appreciates you for being here." Counsel also asserted: "[Mr. Norman] comes to the winery at that time, gets there about 9:15, 9:30, the evidence will show, and has one beer. One beer. I know everybody says when you get stopped how many beers did you have? Two or whatever." Next, counsel pointed out that "[Mr. Norman] hits [Mr.] Beninato one time in the head with the gun . . . [Mr. Norman] takes off . . . and he shouldn't have done that . . . and we all know that."

{¶21} Mr. Norman fails to offer any argumentation regarding how the foregoing statements demonstrated counsel's deficiency or lack of preparation. He further fails to argue how counsel's observations prejudiced his defense. The first quote simply thanked the jurors for serving on the panel and suggests neither deficient performance nor prejudice. To the contrary, it is a congenial way to greet the jury and prepare the panel for what the defense hopes to establish.

{¶22} Counsel's observations regarding Mr. Norman's consumption of a beer is also inconsequential. In the context of the entire opening, it is obvious defense counsel was providing a factual picture of the circumstances which led to the incident. Part of that factual picture was Mr. Norman's consumption of *a* beer; not a copious amount of beer or other alcoholic beverages. Consuming too much beer might lead the jury to the conclusion that Mr. Norman's actions were the product of (over) intoxication rather than his "defense of another" defense.

Case No. 2025-A-0023

{¶23} Along similar lines, defense counsel filed a notice of self-defense via defense of another. In doing so, Mr. Norman admitted to the facts of the assault but, given the surrounding circumstances, asserted his actions were a result of his legal right to defend another. *See* R.C. 2901.05(B)(1) ("A person is allowed to act in self-defense, defense of another, or defense of that person's residence."). To the extent Mr. Norman was not intoxicated, his defense would have arguably greater weight. In this additional regard, the mention of Mr. Norman having a beer can be reasonably viewed as strategic.

{¶24} Finally, defense counsel's admission that Mr. Norman should not have fled after the assault is simply a recognition that it would have been easier to address authorities regarding the circumstances of the incident at the scene. This is not an admission of guilt. Rather, it is a recognition that Mr. Norman made a rash decision at the time that he ultimately recognized was made in error. Defense counsel's opening statement does not demonstrate ineffectiveness.

{¶25} Mr. Norman next argues counsel was ineffective because he called no witnesses and offered no exhibits. He also asserts, contrary to this allegation, that defense counsel erred in calling Mr. Norman to testify and recalling two "inconsequential" witnesses; namely, Mr. Beninato as well as Detective Spencer Gale.

{¶26} As noted several times, Mr. Norman's defense was defense of his mother. Prior to the State resting, and without the jury present, the trial court provided Mr. Norman with the following advisement:

> Mr. Norman, I discussed this with you yesterday. I am again going to discuss it with you now because it's a very important decision for you to make in your life. You have a . . . constitutional right to testify and not to testify. If you choose to testify, [the prosecutor] gets to cross-examine you. You've seen her cross-examine other witnesses. If you choose not to

testify, I will instruct the jury that that is your constitutional right, and they cannot hold it against you that you're exercising your constitutional right. Do you understand that?

[Mr. Norman]: Yes, sir.

The Court: It is not yet the time for you to make that decision, and you should only make that decision after you've thoroughly discussed it with [defense counsel], who is a very experienced and successful lawyer. But I would encourage you to follow his advice.

[Mr. Norman]: Yes, sir.

{¶27} Mr. Norman decided to exercise his constitutional right to testify on behalf of his defense. During his testimony, he highlighted his version of events, which were substantially similar to his original interview with police. He emphasized he told Mr. Beninato not to go to his mother's house after he and his mother left the Beninato residence. He also described that he was aware that Mr. Beninato had previously "put his hands on" Ms. Hamilton. He also testified that he was aware that Mr. Beninato carried a firearm. At the time of the incident, Mr. Norman stated that once Mr. Beninato arrived at Ms. Hamilton's residence:

> [M]y mom ran outside, and then, ah, they started going back and forth. And then I come out the door, and then he has my mom up against the car and my mom's screaming. He's slamming her back and forth. So I turn around and I go right into the closet where I know my wife's gun was that we left there two days prior to that, and I grab it 'cause it wasn't loaded, it wasn't nothing. I run outside, and then I break them up. And then as soon as I break them up, he, like, lunged at me. And then I was - - like, I was fearing for me. Like yeah, he's bigger than me, like I, - - . . . I was. I was more fearful for [my mother] - - that's my only - - that's the only parent I have.

{¶28} In light of these facts, Mr. Norman felt it was necessary to strike Mr. Beninato with the firearm.

Case No. 2025-A-0023

{¶29} On cross-examination, the prosecutor pointed out that, during the initial interview, Mr. Norman did not specifically tell police Mr. Beninato slammed his mother against his truck but only that he was pushing and shoving her. Moreover, Mr. Norman admitted he did not hear that Mr. Beninato was violent towards his mother from her, but from a third party.

{¶30} Mr. Norman's testimony provided his version of events and offered a competing version of that which the prosecutor sought to establish. There is nothing to indicate defense counsel compelled Mr. Norman to testify and, more importantly, there is nothing in his testimony that undermined his theory of the affirmative defense of defense of another. Defense counsel cannot be viewed deficient for honoring Mr. Norman's desire to testify in his own defense and, moreover, there is nothing to indicate the testimony was prejudicial to Mr. Norman's defense.

{¶31} Furthermore, when defense counsel recalled Mr. Beninato, he was able to establish Mr. Beninato had, on one occasion, pushed Ms. Hamilton against a wall and, on another, threw his phone at her dashboard and broke her vehicle's window. These points could substantiate Mr. Norman's position that Mr. Beninato had a tendency to violent behavior towards Ms. Hamilton. This witness was therefore not "inconsequential."

{¶32} Finally, defense counsel recalled Detective Spencer Gale. Detective Gale obtained a "dump" or a transference of information from Mr. Norman's phone. The detective was asked whether he ever obtained a "dump" or collected evidence from Mr. Beninato's phone. He testified he did not. Although the point is subtle, defense counsel's recall of Detective Gale suggests the defense's intent was to show the State's investigation was not even-handed or thorough.

{¶33} Counsel called witnesses, and those witnesses were not irrelevant, and the testimony they offered lent support to Mr. Norman's defense. Moreover, "[t]he decision to call a witness is within the province of counsel's trial tactics." *Kovacic*, 2012-Ohio-219, at ¶ 46 (11th Dist.). It also stands to reason that the decision to submit exhibits is a tactical decision. Mr. Norman offers no basis to suggest defense counsel's decision to call the witnesses at issue, including himself, was an unsound or unreasonable trial tactic. Further, he fails to argue what exhibit, if any, would have further assisted in his defense. We conclude Mr. Norman has failed to establish defense counsel's ineffectiveness on these points.

{¶34} Next, Mr. Norman claims defense counsel failed to cross-examine any of the State's witnesses. This statement is fundamentally false.

{¶35} Defense counsel cross-examined each witness called by the State. In cross-examining Mr. Beninato, defense counsel elicited testimony that Mr. Beninato had a blood-alcohol content of .237 on the night of the incident and had no memory of what occurred at Ms. Hamilton's residence. Given the evidence submitted by Mr. Norman on direct examination, this testimony tends to show that, in conjunction with a purported history of violence against Ms. Hamilton, Mr. Beninato's intoxication may have exacerbated the physical altercation.

{¶36} Further, defense counsel cross-examined each of the police officers the State called. During cross of Officer Mark Allen, defense counsel elicited testimony that Ms. Hamilton had a strong odor of alcoholic beverage on her person on the night of the incident indicating Ms. Hamilton *and* Mr. Beninato were both intoxicated. A common

inference would indicate that intoxication of both individuals could have exacerbated the encounter between them and further support Mr. Norman's defense.

{¶37}  Lieutenant Christopher Defina testified on cross-examination that, upon his arrival at the scene, Ms. Hamilton was not making sense and was frantic and intoxicated. On cross of Lieutenant Michael Palinkas, defense counsel determined the officer was not wearing a body camera when he initially spoke with Mr. Norman and, as such, there was no independent verification of Mr. Norman's statements at that time. And, on cross of Detective Spencer Gale, defense counsel elicited testimony that, during a recorded interview, Mr. Norman stated Ms. Hamilton exited the home first and Mr. Norman proceeded to exit the home with the gun to defend her from Mr. Beninato. Detective Gale also acknowledged that, during the interview, he told Mr. Norman he would have defended his mother under such circumstances.

{¶38}  Defense counsel also cross-examined Ms. Hamilton at great length and, during this testimony, defense counsel obtained a standing order that Ms. Hamilton could testify to matters that occurred prior to the October 22, 2023 incident. As such, during his cross, defense counsel elicited testimony that Mr. Beninato had "punched out" Ms. Hamilton's windshield a week before the incident. Ms. Hamilton stated that, after that encounter, she "broke it off" with Mr. Beninato. Defense counsel was also able to establish that, according to Ms. Hamilton, Mr. Beninato had previously punched and broke her television and "put [her] head through the wall." During that incident, Ms. Hamilton stated Mr. Beninato also spit on her and mocked her as she was crying. She testified she never called police because she was fearful of Mr. Beninato.

Case No. 2025-A-0023

{¶39} In addition to the foregoing, defense counsel regularly leveled objections to testimony and evidence he believed were inadmissible. While many objections were overruled, some were sustained. These are eventualities not uncommon in the course of a trial.

{¶40} Considering the foregoing, Mr. Norman's assertion that defense counsel was ineffective because he failed to cross-examine any of the State's witnesses or was otherwise ill-prepared is patently contrary to the record and without merit.

{¶41} Mr. Norman next claims defense counsel was ineffective for failing to object to State's Exhibit 23, the interview of Mr. Norman. We fail to see how defense counsel's decision not to object to the introduction of the interview fell below reasonable performance.

{¶42} The interview, like Mr. Norman's testimony, essentially clarified his version of events. He stated he witnessed Mr. Beninato assaulting his mother and he, in turn, struck him with the firearm. This is consistent with Mr. Norman's defense. As such, defense counsel's omission cannot be considered ineffective assistance.

{¶43} Mr. Norman next asserts defense counsel was ineffective for proffering "nonsensical evidence." Specifically, defense counsel proffered emails and statements that Mr. Beninato allegedly sent and said to Ms. Hamilton after the incident. The trial court determined that such evidence was not admissible. We fail to see, however, that counsel's proffer was an example of deficient performance that prejudiced Mr. Norman. To the contrary, defense counsel was simply preserving the record in the event an error was assigned on appeal regarding the trial court's ruling.

{¶44} Similarly, Mr. Norman claims defense counsel was ineffective for making a "frivolous and bizarre motion to dismiss" based upon prosecutorial misconduct. The basis for the motion was that defense counsel did not receive the information extracted from Mr. Norman's phone. Counsel asserted the defense should have had access to the extraction in its entirety because "[t]here might have been exculpatory evidence on there from previous times." Defense counsel underscored that the prosecutor "made a big deal" about Mr. Norman knowing nothing about the alleged abuse committed by Mr. Beninato against Ms. Hamilton. Counsel maintained that, by withholding the extraction, the prosecutor committed misconduct. The trial court overruled the motion based upon evidence that nothing, other than potential cumulative information, was gathered from the phone. We conclude that defense counsel's motion was neither frivolous nor bizarre. It was a bona fide attempt to defend Mr. Norman via a motion to dismiss outside the presence of the jury. This action is not an instance of ineffectiveness.

{¶45} Next, Mr. Norman alleges counsel was ineffective for failing to renew his Crim.R. 29 motion for acquittal at the close of the evidence. Where an appealing party fails to renew a motion for acquittal at the close of evidence, such an omission does not forfeit or waive his or her right to argue evidential sufficiency on appeal. *See State v. Brown*, 2007-Ohio-2005, ¶ 35 (5th Dist.). In *Brown*, the court observed "'[i]n two apparently little-recognized cases, however, the Ohio Supreme Court stated that a failure to timely file a Crim.R. 29(A) motion during a jury trial does not waive an argument on appeal concerning the sufficiency of the evidence.'" *Brown* at ¶ 35, quoting *State v. Coe*, 2003-Ohio-2732, ¶ 19 (4th Dist.), citing *State v. Jones*, 2001-Ohio-57, ¶ 48 (holding "[a]ppellant's 'not guilty' plea preserved his right to object to the alleged insufficiency of

the evidence proving the prior offense."), citing *State v. Carter*, 1992-Ohio-127, ¶ 25. The failure to renew the motion for acquittal did not prejudice Mr. Norman.

{¶46} Mr. Norman next challenges defense counsel's "confounding and troubling" closing argument. Mr. Norman first asserts defense counsel's reference to his "memory issues" was a suggestion that he was unable to effectively defend him. Specifically, defense counsel stated, "I'm going to be 74 years old in two days, three days, so it's not done intentionally, but I get old and sometimes my memory is not as good as your collective memories . . . It's not done intentionally." It is unclear how this is evidence of deficient performance or how it could prejudice Mr. Norman. A common reading of counsel's statement would indicate he was simply relating to the jury at a "human" level. Connecting with a jury is fundamental to a litigator's success and counsel's statement, in context, reflects an attempt to establish such a connection. Also, counsel's statement could be understood to provide the jury a plausible and acceptable reason to believe Mr. Norman's defense, regardless of what counsel highlighted in closing. That is, counsel's concession illustrates that his closing, irrespective of the points counsel underscored, should not be viewed as a contradiction of its view of the evidence. The statement is not an admission of inability or disability but a strategic point to assist in Mr. Norman's defense.

{¶47} Next, Mr. Norman takes issue with counsel's reference to Mr. Beninato's alcohol levels at the time of the incident. As observed above, given the ultimate evidence, this point was likely utilized to show that, in conjunction with a purported history of violence against Ms. Hamilton, Mr. Beninato's intoxication may have played a role in his alleged

Case No. 2025-A-0023

instigation of the physical altercation of Ms. Hamilton. Counsel's remark does not show ineffectiveness.

{¶48} Mr. Norman also challenges counsel's mention of his daughter's history with domestic violence. This is not evidence of deficient performance, let alone evidence that defense counsel somehow prejudiced Mr. Norman's defense. The remark, read in context, was meant to show that potentially abused women "keep going back" to their abusers. Explaining, in this case, why Ms. Hamilton may have went outside her residence to confront Mr. Beninato prior to the incident.

{¶49} Mr. Norman also claims defense counsel's statement that he made many mistakes, errors, and terrible choices that night rendered his assistance ineffective. Defense counsel's statements, in context, represent a reasonable attempt to humanize Mr. Norman to the jury. The statements show Mr. Norman's recognition that his behavior on the night of the incident was not ideal, despite his defense-of-another defense.

{¶50} Similarly, counsel's recognition that Mr. Norman was aware, when the police arrived at his residence the day after the incident, that he was "probably going to jail, prison" was an acknowledgment to the jury that Mr. Norman was scared of and concerned about the consequences of his action. This is not an admission of guilt, but a recognition of Mr. Norman's feelings upon commencement of a formal investigation.

{¶51} Likewise, in the course of closing, defense counsel recognized that Mr. Norman lied about the location of the firearm which counsel characterized as "[a]nother dastardly, stupid thing to do." Defense counsel's point was not to impugn Mr. Norman, but to show that Mr. Norman was aware that this lie was improper and would only cast

Case No. 2025-A-0023

doubt on his motivation for striking Mr. Beninato. These statements were reasonably strategic messages to the jury and cannot provide a basis for a claim of ineffectiveness.

{¶52} Finally, Mr. Norman points out that defense counsel misstated that there was no evidence that the firearm used in the incident was operational. We agree that this statement is belied by the record. Nevertheless, the statement could be viewed as counsel equating "unloaded" with "inoperable." Although not legally correct, colloquially counsel may have been attempting to speak to the jury's common instincts. Regardless, we decline to hold that a defense lawyer is ineffective because he or she might overstate a client's defense during closing. In this case, we conclude that the possible overstatement did not render counsel's assistance ineffective.

{¶53} Taken together, we hold that defense counsel was not deficient in his performance during closing and Mr. Norman suffered no prejudice from counsel's representations to the jury.

{¶54} Mr. Norman next claims that "trial counsel did nothing and said nothing at appellant's sentencing" and was therefore ineffective. At sentencing, defense counsel stated that he had reviewed the presentence investigation report ("PSI") and had no insertions or deletions. He also advised the court that Mr. Norman had a right to allocution, which Mr. Norman declined to exercise. Mr. Norman fails to identify what else defense counsel should have or could have done that would have redounded to his benefit. He also fails to identify how counsel's actions or lack of action prejudiced him at sentencing. There was a PSI that was ordered and reviewed. Moreover, the jury did not accept Mr. Norman's defense-of-another defense. The court, with these points in mind, was obligated to impose a lawful sentence. Counsel's reticence or decision not to speak can

be viewed as a reasonable strategy. If counsel reasserted the defense that the jury did not accept, Mr. Norman could be seen as lacking contrition for the actions of which he was convicted. We fail to see how counsel was ineffective for not speaking more to mitigate Mr. Norman's sentence.

{¶55} Next, Mr. Norman asserts defense counsel was ineffective because he "failed to advise the appellant to accept a plea deal." This argument lacks fundamental merit.

{¶56} The Sixth Amendment, which "grants to the accused personally the right to make his defense," "speaks of the 'assistance' of counsel, and an assistant, however expert, is still an assistant." *Faretta v. California,* 422 U.S. 806, 819-820 (1975). The Sixth Amendment "contemplat[es] a norm in which the accused, and not a lawyer, is master of his own defense." *Gannett Co. v. DePasquale,* 443 U.S. 368, 382, fn. 10 (1979), citing *Faretta* at ¶ 819-820. Trial management is an attorney's province: Counsel provides his or her help by making decisions such as "'what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence.'" (Citations omitted.) *Gonzalez v. United States,* 553 U.S. 242, 248 (2008), quoting *New York v. Hill*, 528 U.S. 110, 115 (2000). Some decisions, however, are reserved for the defendant/client—"notably, whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal." *McCoy v. Louisiana*, 584 U.S. 414, 422 (2018), citing *Jones v. Barnes,* 463 U.S. 745, 751 (1983).

{¶57} On February 25, 2024, prior to trial, a status hearing was held wherein Mr. Norman rejected a plea offer that would require him to plead guilty to felonious assault and domestic violence in Case No. 2023-CR-567 (involving an unknown victim) to run

consecutively with charges of felonious assault and having weapons while under disability in Case No. 2023-CR-568 (the underlying matter). At the hearing, Mr. Norman stated that the offer would require him "to do six years for the both - - or put them together for that one; and then the next one, they're going to put those together with the six and equal out to 12, with a tail." After discussion with the court, Mr. Norman rejected that plea offer, and the trial court indicated that Mr. Norman understood the nature of the offer.

{¶58} On August 5, 2024, prior to trial, the parties convened for a second status conference/plea offer. The second plea offer was only related to Case No. 2023-CR-568 (the underlying matter), and the State indicated it would be willing to dismiss the firearm specification on the felonious assault charge "for a stipulated sentence of six years." After the court confirmed that Mr. Norman understood the offer, he rejected it.

{¶59} Mr. Norman clearly desired to proceed to trial, and defense counsel could not compel Mr. Norman to enter the plea. Considering Mr. Norman's representations on record, with counsel assisting him, we conclude defense counsel was not ineffective for failing to advise Mr. Norman to enter one of the pleas offered by the State.

{¶60} Finally, Mr. Norman claims defense counsel was ineffective for, at some point, representing both himself and Ms. Hamilton, the "State's key witness." We do not agree.

{¶61} During Ms. Hamilton's direct examination, she admitted that Mr. Norman's defense counsel "was" her attorney.[1] Even if, however, there is a real question of the ethical propriety of counsel formerly (or currently) representing Ms. Hamilton, thereby

---

1. The State did not specifically object to this revelation. Further, it is unclear whether Ms. Hamilton meant defense counsel still "was" her attorney or, in the past, "was" her attorney.

Case No. 2025-A-0023

creating a potential issue of performance deficiency, Mr. Norman fails to establish any prejudice.

{¶62} During Ms. Hamilton's cross-examination, defense counsel elicited testimony that inured to Mr. Norman's advantage and assisted his defense. Ms. Hamilton stated on direct examination by the State that she initially lied to police regarding Mr. Beninato pushing and shoving her. Ms. Hamilton testified she was not attempting to help Mr. Norman's defense. Nevertheless, Ms. Hamilton, on cross-examination, testified to various incidents which occurred prior to the underlying matter where Mr. Beninato was behaving violently toward her. Even if defense counsel had a conflict of interest in cross-examining his own previous or current client, any prejudice was shouldered by the State, not Mr. Norman. In the context of the defense, Mr. Norman suffered no prejudice from the potential conflict.

{¶63} Mr. Norman's first assignment of error lacks merit.

{¶64} Mr. Norman's second assignment of error alleges:

{¶65} "The trial court erred in excusing jurors inconsistently."

{¶66} Under this assigned error, Mr. Norman asserts the trial court erred by removing one juror, A.H., from the panel after the close of evidence and allowing another, N.K., to remain. We disagree.

{¶67} After the defense rested, the prosecutor advised the court that "someone in the courtroom is posting on Facebook about our trial . . . ." It was determined that A.H. had received a message to her personal Facebook account from one Rick Noble—an acquaintance of Mr. Norman. A.H. brought the issue to the attention of the court and the

Case No. 2025-A-0023

court interviewed each juror. The record indicates that the trial court had advised the jurors not to check Facebook or any other social media.

{¶68} "In cases involving outside influence on jurors, trial courts are granted 'broad discretion' in dealing with the contact and determining whether to declare a mistrial or to replace the affected juror." *State v. McKnight*, 2005-Ohio-6046, ¶ 191, quoting *State v. Phillips*, 1995-Ohio-171, ¶ 54.

{¶69} The trial judge took the matter seriously. The judge requested a police officer to take a screenshot of the messages in question. The court, in addressing the contact with A.H., noted the person attempting to contact her "was trying to give you information you're not supposed to have." A.H. advised the court that she saw "a name and then [she] didn't look at anything else."

{¶70} After the interview with A.H., the trial court asked if any other juror had contact with Facebook. Juror N.K. volunteered that he "don't do Facebook," but "just scrolled." The trial court asked N.K. did "you look at anything involving any person or any subject matter about this case?" N.K. responded, "No, sir." The court then confirmed that simply looking at Facebook would not affect N.K.'s view of the subject matter in the case.

{¶71} Ultimately, the State requested A.H. be excused because "the concern I'm having is the fact that someone on Facebook knows she's a juror." Defense counsel argued that, during the court's dialogue with A.H., the juror could be fair and impartial regardless of the contact. Moreover, defense counsel emphasized that the court cured any issue through its statements and caveats that the jury should only consider the evidence.

{¶72}    The trial court granted the State's request to excuse A.H. Defense counsel argued, however, that if the trial court was going to excuse A.H., it should, by implication, excuse N.K. The trial court determined: "Based upon my review of Rick Noble's Facebook page where I did not see this on there, and based upon my looking at [A.H.'s] personal cell phone and Facebook messages, I will be excusing her because it looks like she may have been targeted." The trial court emphasized that the court's decision did not suggest Mr. Norman had anything to do with the third-party-to-juror contact.

{¶73}    Defense counsel strenuously argued that the dismissal of A.H. from the jury was inappropriate. And, even if A.H.'s dismissal from the panel was proper, counsel asserted that N.K.'s inclusion was problematic. Defense counsel argued that if one juror violated the court's declaration not to peruse Facebook or other social media sites, then any other juror who did should be excused as well. In other words, defense counsel maintained that either both jurors should stay or both should go.

{¶74}    The trial court only excused A.H. because, after reviewing the juror's cell phone, it appeared she was specifically targeted by Rick Noble. The trial court's review of A.H.'s cell phone indicated there may have been an attempt to influence her. Mr. Norman does not offer any argument to the contrary.

{¶75}    N.K., alternatively, stated he had received no messages relating to the case. He could not be viewed as a "target" of outside influence in this respect.

{¶76}    Given the trial court's statement regarding juror targeting, we hold the dismissal of juror A.H. was reasonable and not in *any* way inconsistent with its decision to allow juror N.K. to remain on the panel. This decision is sufficient to uphold the trial court's decision.

{¶77} Further, it bears noting that, when A.H. was removed, there was only a single alternate juror remaining. Had both A.H. and N.K. been removed, the parties would have either needed to stipulate to a jury of 11 or declare a mistrial. *State v. Wilson*, 2002-Ohio-1854, ¶ 73-74 (1st Dist.), citing *United States v. Toribio-Lugo*, 164 F.Supp.2d 251 (P.R. 2001). Given that N.K. was not an arguable target on social media and the court believed A.H. was, *and*, if both jurors were excused, the proceedings were subject to a mistrial after submission of all evidence, we discern no abuse of discretion in the court's decision.

{¶78} Mr. Norman's second assignment of error lacks merit.

{¶79} For his third assigned error, Mr. Norman asserts:

{¶80} "The trial court erred in admitting hearsay with regard to serious physical harm/injuries."

{¶81} Mr. Norman asserts the State was required to prove serious physical harm to establish the felonious-assault charge. The State, however, failed to call a medical expert to testify to Mr. Beninato's injuries and also failed to produce authenticated medical records of such injuries. Mr. Norman asserts that the State only called Mr. Beninato to testify to his injuries. Mr. Norman points out that those records from the Ashtabula County Medical Center, which were properly introduced, contained no diagnosis. Further, the substantial records submitted from MetroHealth were not certified and should not have been introduced. Mr. Norman maintains that, other than hearsay, there was no proof of serious physical harm or injury.

{¶82} While Mr. Normann provides a reasonably sound argument regarding the records submitted by the State, he fails to recognize that R.C. 2903.11(A)(2) allows the

Case No. 2025-A-0023

State to prove felonious assault when a victim suffers "physical harm" when the attack occurs with a deadly weapon. Mr. Norman was indicted based upon the allegation that he "did knowingly cause serious physical harm to [Mr. Beninato] and/*OR* did knowingly cause or attempt to cause physical harm to [Mr. Beninato] by means of a deadly weapon or dangerous ordinance, to wit: handgun . . ." (Emphasis added.)

{¶83} The State concedes that the introduction and admission of the medical records from MetroHealth was error. We do not disagree. Nevertheless, even if the records were excluded, there was sufficient, credible evidence to support the jury's finding that Mr. Norman committed felonious assault under R.C. 2903.11(A)(2). As such, the admission of the records was harmless.

{¶84} Specifically, photos of Mr. Beninato's injuries were taken after the incident. They depict a particularly gruesome head injury which was bleeding profusely. Moreover, the photos demonstrated that Mr. Beninato's head bleed was so significant that blood had puddled next to him as he sat unresponsive after the incident. Moreover, Mr. Norman admitted the fact of the assault in which he "pistol whipped" Mr. Beninato in the head.

{¶85} R.C. 2901.01(A)(3) defines "physical harm to persons" as "any injury, illness, or other physiological impairment, regardless of its gravity or duration." While the State could have called the treating physician at MetroHealth or an analogous caregiver with first-hand knowledge of the specific injuries Mr. Beninato suffered, the photographic exhibits were sufficient to establish that Mr. Beninato experienced physical harm due to Mr. Norman striking him with a deadly weapon. The depictions of Mr. Beninato's injuries in the photos demonstrate that he suffered physical harm and this conclusion is consistent with a layperson's common knowledge or experience of a "physical injury." *See State v.*

Case No. 2025-A-0023

*Segoria*, 2024-Ohio-1392, ¶ 40-41 (2d Dist.) (photos of injuries sufficient to establish *serious* physical harm in a felonious assault prosecution).

{¶86}   Mr. Norman's third assignment of error is without merit.

{¶87}   For his fourth assigned error, Mr. Norman asserts:

{¶88}   "The trial court's sentence was unreasonable and contrary to law."

{¶89}   R.C. 2953.08(G) governs an appellate court's review of felony sentences, and provides, in relevant part, that after an appellate court's review of the record, it "may increase, reduce, or otherwise modify a sentence that is appealed under this section or may vacate the sentence and remand . . . if it clearly and convincingly finds either . . . [t]hat the record does not support the sentencing court's findings under division . . . (C)(4) of section 2929.14 [to impose consecutive sentences] [or t]hat the sentence is . . . contrary to law." *See also State v. Lamb*, 2023-Ohio-2834, ¶ 9 (11th Dist.); *State v. Gwynne*, 2023-Ohio-3851, ¶ 15.

{¶90}   ""[A] sentence is contrary to law when it does not fall within the statutory range for the offense or if the trial court fails to consider the purposes and principles of felony sentencing set forth in R.C. 2929.11 and the sentencing factors set forth in R.C. 2929.12."" *Lamb* at ¶ 10, quoting *State v. Shannon*, 2021-Ohio-789, ¶ 11 (11th Dist.), quoting *State v. Brown*, 2017-Ohio-8416, ¶ 74 (2d Dist.).

{¶91}   That said, "this court has frequently noted that 'even though a trial court is required to consider the R.C. 2929.11 and R.C. 2929.12 factors, it is not required to make specific findings on the record to comport with its statutory obligations.'" *Lamb* at ¶ 10, quoting *Shannon* at ¶ 17.

Case No. 2025-A-0023

{¶92}   "[A] trial court 'fulfills its duty under the statutes by indicating that it has considered the relevant sentencing factors.'" *State v. Clinton*, 2017-Ohio-9423, ¶ 243, quoting *State v. Smith*, 2014-Ohio-1520, ¶ 14 (8th Dist.).

{¶93}   Further, even where the record is silent as to R.C. 2929.11 and R.C. 2929.12, there is a presumption that the court considered the required factors; that is, consideration of the appropriate factors set forth in R.C. 2929.11 and R.C. 2929.12 can be presumed unless the defendant affirmatively shows to the contrary. *State v. Jones*, 2014-Ohio-29, ¶ 13 (8th Dist.). And, significantly, "[n]othing in R.C. 2953.08(G)(2) permits an appellate court to independently weigh the evidence in the record and substitute its judgment for that of the trial court concerning the sentence that best reflects compliance with R.C. 2929.11 and 2929.12." *State v. Jones*, 2020-Ohio-6729, ¶ 42.

{¶94}   In entering sentence, the trial court stated it considered the purposes and principles of the sentencing statutes. It also stated it considered the overriding purpose to punish offenders and protect the public from future crimes. The trial court reviewed the PSI, which indicated Mr. Norman had a juvenile record and a lengthy adult record. The trial court recited various crimes in which Mr. Norman was involved, each of which included the use of violence. The court therefore concluded that recidivism was likely. The court also reviewed the facts of the case and determined that the "more-serious" factors overrode the "less-serious" factors. The court proceeded to sentence Mr. Norman to three years on the firearm specification, eight to 12 years on the felonious assault charge to be served consecutively with a 36-month prison term for the weapons under

Case No. 2025-A-0023

disability charge. The court made all the necessary findings under R.C. 2929.14(C)(4) to impose consecutive sentences.[2]

{¶95} Mr. Norman's fourth assignment of error lacks merit.

{¶96} Mr. Norman's fifth and sixth assigned errors shall be addressed together. They provide:

> "[5.] The appellant's conviction (jury verdict) was against the sufficiency of the evidence.
>
> "[6.] The appellant's conviction (jury verdict) was against the manifest weight of the evidence."

{¶97} Mr. Norman's assignments of error challenge the sufficiency and weight of the evidence supporting the conviction. When an appealing party challenges both the sufficiency and the weight of the evidence, an appellate court's conclusion that the verdict is consistent with the manifest weight presupposes it was also supported by sufficient evidence. *State v. Masters*, 2020-Ohio-864, ¶ 17 (11th Dist.).

{¶98} With this point in mind, a court reviewing a challenge to the manifest weight of the evidence observes the entire record, "'weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Schlee*, 1994 WL 738452, *5 (11th Dist. Dec. 23, 1994), quoting *State v. Davis*, 49 Ohio App.3d 109, 113 (8th Dist. 1988). Put differently, the court must assess conflicting

---

2. Although the court did not recite the R.C. 2929.14(C)(4) factors verbatim, the court did determine that the victim suffered a very serious injury, and that Mr. Norman's history of criminal conduct demonstrated that consecutive sentences are necessary to protect the public from future crimes. Further, in setting forth its "recidivism-likely" discussion, the court indicated that Mr. Norman represented a danger to the public. Even though the court's imposition of consecutive sentences on each count is not a model of statutory compliance, the record the court made at the sentencing hearing sufficed to meet its burden.

Case No. 2025-A-0023

testimony, review rational inferences that may be drawn from the evidence, and evaluate the strength of the conclusions drawn therefrom. A challenge to the weight of the evidence requires a court to consider whether the State met its burden of persuasion. *State v. McFeely*, 2009-Ohio-1436, ¶ 78 (11th Dist.).

{¶99} Under his final assignments of error, Mr. Norman asserts he had no intent to harm Mr. Beninato. Specifically, Mr. Norman contends the State failed to establish he knowingly caused physical harm to Mr. Beninato with a deadly weapon. Instead, he asserts he was simply trying to protect Ms. Hamilton and Mr. Beninato's injuries were a coincidence of his true and admitted intent.

{¶100} "Proof of guilt in a criminal prosecution may be made by circumstantial evidence, real/physical evidence, and direct evidence, or any combination of the three, and all three have equal probative value." *State v. Dietrich*, 2024-Ohio-2039, ¶ 13 (11th Dist.).

{¶101} The mens rea of knowingly is statutorily defined as follows:

> A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact.

R.C. 2901.22(B).

{¶102} Further, "[t]he legal concept of 'knowingly' incorporates the scienter requirement that one ought to know one's actions will 'probably cause certain results.'

Case No. 2025-A-0023

The concept of reasonable probability literally embraces the concept of foreseeability." *State v. Barker*, 2012-Ohio-522, ¶ 114 (11th Dist.),

{¶103} In this matter, a reasonable juror could conclude that striking another person in the head with a firearm, regardless of Mr. Norman's motivation or his subjective desires, would cause physical harm to Mr. Beninato. One can easily foresee such an outcome and the outcome is probable. As a result, we conclude that Mr. Norman, regardless of his personal motivation or purpose, can be imputed with an awareness and therefore legal "knowledge" that his actions would probably cause the result that occurred.

{¶104} Mr. Norman's fifth and sixth assigned errors lack merit.

{¶105} For the reasons discussed in this opinion, the judgment of the Ashtabula County Court of Common Pleas is affirmed.

MATT LYNCH, P.J.,

ROBERT J. PATTON, J.,

concur.

Case No. 2025-A-0023

# JUDGMENT ENTRY

For the reasons stated in the opinion of this court, appellant's assignments of error are without merit. It is the judgment and order of this court that the judgment of the Ashtabula County Court of Common Pleas is affirmed.

Costs to be taxed against appellant.

_____
JUDGE EUGENE A. LUCCI

_____
PRESIDING JUDGE MATT LYNCH,
concurs

_____
JUDGE ROBERT J. PATTON,
concurs

**THIS DOCUMENT CONSTITUTES A FINAL JUDGMENT ENTRY**

A certified copy of this opinion and judgment entry shall constitute the mandate pursuant to Rule 27 of the Ohio Rules of Appellate Procedure.

Case No. 2025-A-0023